## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Stephanie Hungerford,<br><br><br>Plaintiff,<br><br><br>v.<br><br><br>Carolyn Colvin,<br>Commissioner of Social Security,<br><br><br>Defendant. | Civil No. 14-0613 (DSD/HB)<br><br><br><br>**REPORT AND**<br>**RECOMMENDATION** |

Dana W. Duncan, Duncan Disability Law SC, 3930 Eighth Street South, Suite 201, Wisconsin Rapids, WI 54494, and Glen A. Norton, Henningson & Snoxell Ltd., 6900 Wedgwood Road, Suite 200, Maple Grove, MN 55311, for Plaintiff.

Ana H. Voss and Ann M. Bildtsen, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Defendant.

HILDY BOWBEER, United States Magistrate Judge

## I.    Introduction

Under 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied Plaintiff's application for disability insurance benefits and supplemental security income.  This matter is before the Court on the parties' cross-motions for summary judgment.  (Pl.'s Mot. Summ. J. [Doc. No. 14]; Def.'s Mot. Summ. J. [Doc. No. 18].)  This matter has been referred to the undersigned United States Magistrate Judge for Report and Recommendation under 28 U.S.C. § 636(b)(1) and District of Minnesota Local Rule

72.1.  For the reasons set forth below, this Court recommends that Plaintiff's motion be denied, and Defendant's motion be granted.

## II.    Background

### A.    Procedural Background

Plaintiff filed an application for disability insurance benefits and supplemental security income on September 29, 2010, alleging a disability onset date of May 31, 2009. (R. 154.)[1]  The Social Security Administration ("SSA") denied Plaintiff's claims initially and upon reconsideration.  (R. 49-50, 53-54.)  On July 12, 2012, Plaintiff attended and testified in a hearing before the Administrative Law Judge ("ALJ"), who denied Plaintiff's claim on August 6, 2012.  (R. 16-31, 34-48.)  Plaintiff sought review of the ALJ's decision, and the Appeals Council denied review on September 26, 2013.  (R. 3-6.)

### B.    Factual Background

Plaintiff was born on February 22, 1956, and completed a high-school education in 1974.  (R. 139, 192.)  Plaintiff has worked as a gardener in various greenhouses, machine operator at an envelope manufacturer, night employee at a department store, order picker at an eyeglass manufacturer, and stockperson at a grocery store.  (R. 139.)  She last worked as a gardener on May 31, 2010.  (*Id.*)

In her applications for disability insurance benefits and supplemental security income, Plaintiff alleged that she has been disabled since May 31, 2009, due to hip and back problems, diabetes, and thyroid problems.  (R. 19.)

---

[1]  The Social Security Administrative Record ("R.") is available at Doc. No. 13.

### 1.   Plaintiff's Function Report

On October 16, 2010, Plaintiff completed a function report for the SSA.  (R. 157-83.)  In the function report, Plaintiff stated that it was "very hard to stand or sit for any len[g]th of time," and the pain "run[ning] down [her] legs" affected her sleep.  (R. 165-66.)  Plaintiff also described her daily activities, which included "try[ing] to get some work done around [the] house before pain kicks in," and caring for her pets with her husband's assistance.  (R. 166.)  Plaintiff indicated that she prepared full meals daily, did laundry once per week, and shopped for food in stores.  (R. 170-71.)  Plaintiff listed gardening and fishing as interests, noting that she could not garden as well anymore due to the pain.  (R. 172.)  Plaintiff wrote that her condition affected her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks.  (R. 173.)  Her abilities to talk, hear, see, remember, concentrate, understand, follow instructions, use her hands, and get along with others were not affected.  (*Id.*)  Plaintiff stated that she could pay attention for as long as needed, finish what she started, and follow written and spoken instructions "OK."  (*Id.*)  She reported getting along "OK" with authority figures, and handling stress "sometimes OK and some[times] not as good."  (R. 174.)

### 2.   Medical Records

The record in this matter includes medical records from several treating physicians – Dr. Nader Ailabouni, Dr. Anna Marie Cole, and Dr. Stacy Hockett — and from Dr. Marlin Trulsen, who saw Plaintiff for a consultative examination in connection with her symptoms of depression.  The following discussion sets forth the information, observations and findings described in those records.

On April 16, 2010, Dr. Ailabouni met with Plaintiff regarding her chronic diarrhea and nausea, which had been occurring for the last year.  (R. 204.)  Labs, stool cultures, and celiac studies were taken.  (R. 205.)  Dr. Ailabouni recommended a colonoscopy, which Plaintiff deferred.  (*Id.*)

On August 17, 2010, Plaintiff met with Dr. Cole to discuss her left buttock pain, which started two weeks prior and had been severe for the past two days.  (R. 203.)  Plaintiff reported that she felt pain while standing and during the night, and the pain radiated down the left leg.  (*Id.*)  Dr. Cole noted Plaintiff had a history of a herniated disc that was treated with physical therapy.  (*Id.*)  On August 19, 2010, Dr. Cole informed Plaintiff that her x-ray showed moderate degenerative arthritis and disc space narrowing of the lumbar spine, which might be causing Plaintiff's pain, and recommended that Plaintiff should treat with the prescribed medications.  (R. 200.)

On August 31, 2010, Plaintiff met with Dr. Hockett to follow up on the left lumbar radiculopathy, which remained "about the same."  (R. 201.)  Plaintiff did not think the medications had helped much and wanted stronger prescriptions.  (*Id.*)  Dr. Hockett counseled Plaintiff on the expected course, recovery, and potential setbacks for the lumbar radiculopathy; discussed the pathophysiology of diabetes and the importance of instituting appropriate lifestyle changes; and checked Plaintiff's hypothyroidism and moderate recurrent major depression.  (R. 201-02.)  Medication was prescribed for the lumbar radiculopathy, diabetes, and hypothyroidism, and increased for the moderate recurrent major depression.  (*Id.*)  Dr. Hockett noted that Plaintiff should "have everything rechecked in about 8 weeks."  (R. 202.)

4

On July 14, 2011, an MRI was performed on Plaintiff's left knee, in which she was experiencing pain.  (R. 261-62.)  The radiology report noted the following impressions: "[p]roximal patellar tendinosis without evidence of discrete tear," "[m]ild prepatellar bursitis," "[t]race effusion," and "[e]arly marginal osteophyte formation medial and lateral compartments with some thinning and fibrillation of the hyaline cartilage."  (R. 262.)

On November 22, 2010, Plaintiff visited Dr. Trulsen for a consultation about her mental health symptoms.  (R. 209-14.)  Plaintiff described her depression as existing for the past several years, worsening in the last two to three years due to her husband's illness and her son leaving home.  (R. 210.)  Of the medication or psychiatric services she tried, Plaintiff found taking citalopram somewhat helpful.  (*Id.*)  Plaintiff reported no history of psychological or counseling services.  (*Id.*)  In describing her level of daily functioning, Plaintiff stated that she could do her own cleaning, dishes, and cooking, but yard work was too difficult for her back.  (R. 211.)

Dr. Trulsen diagnosed Plaintiff with "[m]ajor depressive disorder, single episode, mild," "[a]djustment disorder with mixed anxiety and depressed mood, chronic," "[d]ysthymic disorder, late onset," and "[a]nxiety disorder, not otherwise specified with panic features."  (R. 213.)  Dr. Trulsen observed that Plaintiff's general mental capacity for understanding, remembering, and following instructions appeared adequately developed and showed no general impairment, and that she showed an average ability to hear and engage in normal conversation.  (*Id.*)  He reported that her mental capacity for sustaining attention and concentrating "may demonstrate occasions of slight impairment"

according to her self-report of current mental health symptoms, but did not appear to be problematic per her report of daily activities.  (*Id.*)  He noted that Plaintiff's mental capacity for executing work-like tasks, responding appropriately to contact with co-workers and supervisors, and tolerating stress in an entry-level workplace "may demonstrate occasions of slight to moderate impairment" per her report of mental health symptoms, but concluded that this would not prevent her from being effective in those areas, in light of her general ability to complete responsibilities and daily activities.  (*Id.*)  Finally, Dr. Trulsen observed that Plaintiff did not appear to have difficulty negotiating stairs, sitting, walking, or standing.  (*Id.*)

### 3.  State Agency Medical Consultants

Several state agency medical consultants reviewed the medical records in Plaintiff's file to evaluate her disability claim.  On December 6, 2010, Dr. Ray Conroe, having reviewed Dr. Trulsen's report, completed a "Psychiatric Review Technique" form, opining that Plaintiff had affective and anxiety-related disorders that caused mild restriction of daily living activities, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  (R. 224, 226, 231.)

Dr. Conroe also completed a "Mental Residual Functional Capacity Assessment." He opined that the following were not significantly limited:

- The ability to remember locations and work-like procedures;

- The ability to understand and remember very short and simple instructions;

- The ability to carry out very short and simple instructions;

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;

- The ability to sustain an ordinary routine without special supervision;

- The ability to work in coordination with or proximity to others without being distracted by them;

- The ability to make simple work-related decisions;

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;

- The ability to interact appropriately with the general public;

- The ability to ask simple questions or request assistance;

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness;

- The ability to respond appropriately to changes in the work setting;

- The ability to be aware of normal hazards and take appropriate precautions;

- The ability to travel in unfamiliar places or use public transportation; and

- The ability to set realistic goals or make plans independently of others.

(R. 243-44.)

Dr. Conroe found the following were moderately limited:

- The ability to understand and remember detailed instructions;

- The ability to carry out detailed instructions;

- The ability to maintain attention and concentration for extended periods; and

- The ability to accept instructions and respond appropriately to criticism from supervisors.

(*Id.*)  Dr. Conroe did not find any of Plaintiff's abilities markedly limited.  (*Id.*)

Dr. Conroe went on to conclude that Plaintiff "retained sufficient mental capacity to concentrate on, understand, and remember routine repetitive and 3-4 step and limited-detail instructions, but would be markedly limited for multi-detailed or complex/technical instructions." (R. 245.)  Similarly, he concluded that Plaintiff would not be significantly limited in her ability to perform, and to tolerate the stresses associated with, "routine repetitive, 3-4 step, and limited detail tasks," although she would be markedly limited for detailed or complex/technical tasks. (*Id.*)

On December 6, 2010, Dr. Gregory Salmi completed a "Physical Residual Functional Capacity Assessment," opining that Plaintiff's "moderate facet articular degenerative changes in the lower lumbar spine" and "[m]oderate degenerative narrowing of the lumbosacral disc space" caused the following limitations: occasionally lift and carry twenty pounds; and frequently lift and carry ten pounds; sit, stand, or walk about six hours in an eight-hour workday.  He also opined that her ability to push and pull was limited in the lower extremities.  (R. 236.)  Dr. Salmi noted no manipulative, visual, communicative, or environmental limitations.  (R. 238-39.)

On May 27, 2011, Dr. Mary Sullivan, reconsidering the December 6, 2010, assessment with regard to both the psychological and physical components, reviewed all of the evidence in the file and affirmed the assessment.  (R. 253-55.)  Dr. Sullivan noted there were "no new psych allegations" on reconsideration.  (R. 254.)  On May 31, 2011,

Dr. Steven Richards also reviewed the file and affirmed the assessment.  Dr. Richards

noted that on reconsideration, Plaintiff was alleging worse pain, but that no new records

supported this allegation.  (R. 257-59.)

### 4.   Written Notices of Right to Counsel

On May 31, 2011, the SSA notified Plaintiff that it had reviewed her claim on

reconsideration.  (R. 64-69.)  This letter stated in part:

> IF YOU WANT HELP WITH YOUR APPEAL
>
> You can have a friend, lawyer or someone else help you.  There are groups
> that can help you find a lawyer or give you free legal services if you
> qualify.  There are also lawyers who do not charge unless you win your
> appeal.  Your local Social Security Office has a list of groups that can help
> you with your appeal.
>
> If you get someone to help you, you should let us know.  If you hire
> someone, we must approve the fee before he or she can collect it.  And if
> you hire a lawyer, we will withhold up to 25 percent of any past due
> benefits to pay toward the fee.

(R. 65, 68.)

On August 2, 2011, Plaintiff submitted a request for hearing by an ALJ.  (R. 70-

71.)  This request stated in part:

> I UNDERSTAND I HAVE A RIGHT TO BE REPRESENTED AND
> THAT IF I NEED REPRESENTATION, THE SOCIAL SECURITY
> OFFICE OR HEARING OFFICE CAN GIVE ME A LIST OF LEGAL
> REFERRAL AND SERVICE ORGANIZATIONS TO ASSIST ME IN
> LOCATING A REPRESENTATIVE.

(R. 71.)

On September 26, 2011, the SSA informed Plaintiff of her right to representation

in a written notice:

You may choose to have a representative help you.  We will work with this person just as we would work with you.  If you decide to have a representative, you should find one quickly so that person can start preparing your case.

Many representatives charge a fee only if you receive benefits.  Others may represent you for free.  Usually, your representative may not charge a fee unless we approve it.  We are enclosing a list of groups that can help you find a representative.

If you get a representative, you or that person must notify us in writing.  You may use our Form SSA 1696 U4 Appointment of Representative.  Any local Social Security office can give you this form.

(R. 72-73.)

### C.   Testimony at the Administrative Hearing

#### 1.   Plaintiff's Testimony

Plaintiff did not have counsel at the July 12, 2012, hearing.  Accordingly, the ALJ first asked Plaintiff whether she would like more time to talk to an attorney:

I must ask you whether you would like more time to talk to an attorney.  You don't have to have one, but they can be helpful, they know the ropes, what evidence to get, how to present it . . . the fees would be no more than $6,000, but it could be less than that if 25 percent of the past due benefits is less.  So with that in mind, would you like to go ahead with [the] hearing or would you like more time to talk to an attorney?

(R. 34-35.)  Plaintiff answered, "I'd just assume go ahead, sir, Your honor."  (R. 35.)

The ALJ responded, "All right, I'll consider that waived then."  (*Id.*)

Plaintiff brought her July 14, 2011, MRI report to the hearing.  (*Id.*)  The ALJ read the impressions from the report and added it to Plaintiff's records.  (R. 35-36.)  Plaintiff stated that she last visited a doctor in September 2011, after falling down stairs and having problems with her shoulder, but did not have any record of that visit.  (R. 36-37.)

10

Plaintiff testified that the pain in her back, hips, and knee prevented her from working.  (R. 38.)  To manage the pain, Plaintiff took "a muscle relaxer," "Tylenol and stuff," but had not undergone any operations due to poor insurance coverage.  (R. 38-39.)  Standing in a "very hot shower" and "tak[ing] a couple Tylenol, two, three Tylenol" relieved the pain most.  (R. 41.)  She could walk approximately one block, lift approximately ten to fifteen pounds, and stand for approximately ten minutes without pain.  (R. 39-40.)  Sitting for two hours was "pretty hard," and stooping and bending at the waist hurt "very much."  (R. 40.)

Plaintiff further testified that she was diabetic, had "bad days with heat and stuff," and her feet felt like there were needles sticking in them.  (R. 46.)  To relieve the sensation in her feet, Plaintiff rubbed or soaked them in warm water, but needed to visit the doctor "because none of those tricks are working anymore."  (*Id.*)  Plaintiff indicated that she did not go to the doctor very often, but needed to go because the irritation was "getting bad."  (R. 47.)  Plaintiff stated that she "really rarely [went] to the doctor unless I'm almost dead."  (R. 36.)

Plaintiff's daily routine consisted of doing dishes, trying to sit and read, and going outside and trying to walk.  (R. 40.)  Plaintiff stated that her husband was in a nursing home after undergoing open-heart surgery, and a friend drove her to visit him.  (*Id.*)  Plaintiff was not able to lift her husband, and in caring for him, he sometimes needed to be moved from the couch to a wheelchair.  (R. 41.)

Plaintiff testified that in the last fifteen years, she had worked in warehouses, plant nurseries, and an envelope factory.  (*Id.*)  Plaintiff found working at the plant nursery to

be the easiest of her jobs, although half of the time she left early due to the pain.  (R. 42.)
Since May 2009, Plaintiff worked at a plant nursery during the summer, but ultimately
could not tolerate the pain from kneeling or standing.  (R. 37.)

### 1.    Vocational Expert's Testimony

A vocational expert, Michael Guckenberg, testified at the hearing.  (R. 19, 42-46.)
The ALJ asked Guckenberg to assume a hypothetical individual of Plaintiff's age and
background, subject to the physical limitations described in Dr. Salmi's report, and
address whether such a person would be able to work in any of Plaintiff's prior jobs.
(R. 43-44.)  Guckenberg testified that such a person could perform the work of a retail
salesperson and order picker.  (R. 44.)  The ALJ also asked the expert to consider
whether such a hypothetical individual, subject to the mental limitations set forth in
Dr. Conroe's report, would be able to work in any of Plaintiff's prior jobs.  (R. 44-45.)
Guckenberg stated that there could be "an occasional problem with the details, but not
significant enough not to ask questions in most cases," and "[t]he jobs she performed, the
order clerk and retail sales, there's a variety (INAUDIBLE) same type of detailed
concentration, that's someone doing a payroll that you might have."  (R. 46.)

### D.    The ALJ's Findings and Decision

On August 6, 2012, the ALJ issued a decision concluding that Plaintiff was not
under a disability.  (R. 19-27.)  In reaching this conclusion, the ALJ followed the five-
step evaluation set forth in the Code of Federal Regulations.[2]  *See* 20 C.F.R.

---

[2]  The United States Court of Appeals for the Eighth Circuit has summarized the five-step
evaluation process as follows:  (1) whether the claimant is currently engaged in

§§ 404.1520(a)(4), 416.920(a)(4).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of May 31, 2009. (R. 21-22.) Although Plaintiff worked as a seasonal gardener after this date, her earnings ($2,661.86) were low. (*Id.*) Thus, the ALJ gave Plaintiff the benefit of the doubt and did not find this work to be disqualifying. (*Id.*)

At step two, the ALJ determined that Plaintiff had the following severe impairments: diabetes mellitus, lumbar facet disease, knee tendonitis with thinning, and shoulder soreness. (R. 22.)

At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 23.) Although the record indicated moderate facet articular degenerative changes of the lumbar spine, and an MRI study of the left knee showed proximal patellar tendinosis, mild pre-patellar bursitis, a trace effusion, and early marginal osteophyte formation, no report demonstrated the level of severity contemplated by the listings. (*Id.*)

---

"substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience)"; (4) "whether the claimant has the residual functional capacity to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work, then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform." *Fines v. Apfel*, 149 F.3d 893, 894-95 (8th Cir. 1998) (citation omitted).

At step four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except she could perform only occasional postural activities. (R. 24-26.) The ALJ found that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms of pain and discomfort," but Plaintiff's statements about the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with the RFC assessment. (R. 24-25.) Specifically, the ALJ noted Plaintiff's testimony that she had worked for a plant nursery both before and after her alleged onset date; nothing confirmed that Plaintiff stopped working primarily because of her medically determinable impairments; no medically significant event occurred on or around her alleged disability onset date that would have rendered her disabled; Plaintiff did not seek any medical treatment for pain, instead relieving the pain with hot showers and Tylenol; and Plaintiff showed no evidence of pain while testifying at the hearing. (R. 25-26.) The ALJ gave "great weight" to the reports by the state agency medical consultants, who limited Plaintiff to light work with occasional postural activities, and "some weight" to the consultative psychologist and the state agency consultant, whose evaluations suggested, in the ALJ's view, that Plaintiff was capable of basic mental work activities in the unskilled and semi-skilled range. (R. 26.)

Ultimately, at step five of the disability determination procedure, the ALJ credited Guckenberg's testimony and found Plaintiff capable of performing past relevant work as an order clerk. (R. 26.) The ALJ therefore concluded that Plaintiff was not under a disability as defined in the Social Security Act from May 31, 2009 through the date of the

14

ALJ's decision.  (R. 26-27.)

## III.   Discussion

### A.   Standard of Review

"The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992).  "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  The claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).  The impairment must have lasted or be expected to last for a continuous period of not less than twelve months, or be expected to result in death.  *Id.* § 423(d)(1)(A).

### 1.   Administrative Review

A claimant may request reconsideration of a decision if her initial application for benefits is denied.  20 C.F.R. § 404.909(a)(1).  If a claimant is dissatisfied with the reconsidered decision, she may seek administrative review by an ALJ.  *Id.* § 404.929.  If a claimant is dissatisfied with the ALJ's decision, she may seek review by the Appeals Council, which is not automatic.  *Id.* §§ 404.967-.982.  The decision of the Appeals Council, or of the ALJ if the request for review is denied, is final and binding, unless the case is appealed to a federal district court within sixty days after notice of the Appeals Council's decision.  *Id.* § 404.981.

15

2.      **Judicial Review**

Judicial review of the Commissioner's decision is limited to a determination of whether substantial evidence on the record as a whole supports the Commissioner's decision.  42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'"  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  "Substantial evidence on the record as a whole" requires a more scrutinizing analysis.  *Gavin*, 811 F.2d at 1199.  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  *Id.*

The Court considers: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required, which must be based upon a proper hypothetical question that sets forth the claimant's impairments. *Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir. 1997).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for the ALJ's. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).  The Court may not reverse the Commissioner's decision simply because substantial evidence

16

would support an opposite conclusion.  *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994).  If it is possible to reach two inconsistent positions from the evidence, and one of those positions represents the Commissioner's decision, the Court must affirm that decision.  *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

### B.     Plaintiff's Claims

Plaintiff makes two arguments in support of her summary judgment motion: (1) the ALJ provided an incomplete RFC, and in particular failed to take adequate account of Plaintiff's mental health limitations as found by the consulting psychologist and state agency reviewer, and (2) the ALJ failed to obtain a valid waiver of the right to counsel, and failed to discharge his heightened duty to develop the record in a hearing with an unrepresented claimant.

### 1.     Residual Functional Capacity

The claimant's RFC is the most a claimant can still do despite her physical or mental limitations.  20 C.F.R. § 404.1545(a)(1).  It is assessed based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of her limitations.  *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006).  The RFC must include the limitations from all medically determinable impairments, including those that are not severe.  20 C.F.R. § 404.1545(a)(2).  The ALJ evaluates the "nature and extent" of the claimant's limitations, and then determines RFC "for work activity on a regular and continuing basis."  *Id.* §§ 416.945(b), (c).

Plaintiff claims that the ALJ erred in assessing her RFC by rejecting the moderate

limitation in concentration, persistence, or pace identified by the state agency consultant.

In the "Psychiatric Review Technique" form, Dr. Conroe found moderate limitation in

Plaintiff's ability to maintain concentration, persistence, or pace.  (R. 231.)  The ALJ,

however, declined to accept this degree of limitation, instead finding her limitation to be

only "mild."  In support of this finding, the ALJ pointed both to the fact that Dr. Trulsen

had identified Plaintiff's limitation in this area as "mild," and to Dr. Conroe's conclusion

in his "Mental Residual Functional Capacity Assessment" that Plaintiff could perform 3-

4 step tasks, which the ALJ viewed as equivalent to semi-skilled or unskilled work.  Such

work, the ALJ noted, "is consistent with the performance of basic mental work

activities."  But, he went on to state, "[e]ven if the undersigned had limited the claimant

to the performance of semi-skilled work, the outcome would be the same since her past

relevant work was at the unskilled, or semi-skilled level, as described by the vocational

expert at the hearing." (R. 23; *see* R. 245.)

        The ALJ did not err in rejecting Dr. Conroe's conclusion that Plaintiff had

moderate difficulties in maintaining concentration, persistence, or pace, because it was

not substantially supported by the record as a whole.  *See Bentley v. Shalala*, 52 F.3d 784,

787 (8th Cir. 1995) ("the ALJ may reject the conclusions of any medical expert, whether

hired by a claimant or by the government, if inconsistent with the medical record as a

whole.").  In the "Mental Residual Functional Capacity Assessment" form, Dr. Conroe

noted that Plaintiff

> retains sufficient mental capacity to concentrate on, understand, and
> remember routine repetitive and 3-4 step and limited-detail instructions, but
> would be markedly limited for multi-detailed or complex/technical

> instructions.  [Plaintiff's] ability to carry out routine repetitive, 3-4 step, and limited detail tasks with adequate persistence and pace would not be significantly limited, but would be markedly limited for detailed or complex/technical tasks.

(R. 245.)  Additionally, Dr. Trulsen's medical examination—on which Dr. Conroe's assessment is based (R. 245), and the only medical examination of Plaintiff's mental status in the record—states that Plaintiff's

> general mental capacity for understanding, remembering and following instructions all appear adequately developed and show no general impairment.  Her general mental capacity for sustaining attention and concentrating may demonstrate occasions of slight impairment per report of current mental health symptoms.  This would not appear to be problematic per report of daily activities.  Her general mental capacity for carrying out work-like tasks with reasonable persistence or pace, respond appropriately to brief and superficial contact with coworkers and supervisors, as well as tolerate stress and pressures typically found in an entry-level workplace may demonstrate occasions of slight to moderate impairment per report of current mental health symptoms.  This would not, however, appear to prevent her from being able to be effective in these areas as suggested by her general ability to complete responsibilities and daily activities.

(R. 213).  Finally, Plaintiff stated in her function report that she could pay attention for as long as she needed, and she did not indicate that her abilities to concentrate, understand, or follow instructions were affected by her condition.  (R. 173.)  These various statements, particularly those of Dr. Trulsen and Plaintiff, undermine Dr. Conroe's finding of moderate limitation to Plaintiff's concentration, persistence, or pace.  The Court finds no error in the ALJ's determination that Plaintiff was mildly, and not moderately, limited in this functional area.

Next, Plaintiff argues that the ALJ erred in assessing her RFC because he failed to consider Plaintiff's non-severe mental impairments.  The Court disagrees.  The ALJ

expressly acknowledged his duty to consider both severe and non-severe impairments in

determining Plaintiff's RFC.  (R. 21.)  The ALJ also explained why he found Plaintiff's

mental impairments non-severe, based on the medical and non-medical evidence in the

record.  Namely, there was no evidence of mental health treatment; Plaintiff did not

allege any mental impairment when she applied for disability; and the sole evidence of

mental impairment was Dr. Trulsen's one-time consultative examination on November

22, 2010.  (R. 22.)  Then, the ALJ methodically considered the four functional areas for

evaluating mental disorders: (1) activities of daily living; (2) social functioning;

(3) concentration, persistence, or pace; and (4) episodes of decompensation.  (R. 22-23.)

In doing so, the ALJ analyzed information from Plaintiff's function report, Dr. Trulsen's

consultative examination, and the reports from the state agency psychological

consultants.  Ultimately, the ALJ found mild limitation in the first three functional areas,

and no episodes of decompensation.  (*Id.*)  Where the alleged mental impairments no

more than minimally limit a claimant's ability to perform basic work activities, there is

no work-related limitation to include in the assessment of RFC.  *Still v. Astrue*,

No. 1:10-cv-00044, 2011 WL 1330106, at *8 (E.D. Ark. Apr. 6, 2011).  Therefore, the

Court finds no error in the ALJ's consideration of Plaintiff's non-severe mental

impairments.

Plaintiff further argues that the ALJ failed to include her non-severe mental

impairments in his hypothetical question to the vocational expert.  Again, the Court

disagrees.  Even though the ALJ had concluded her mental impairments were non-severe,

he assumed the full extent of her alleged mental impairments in describing Plaintiff's

RFC for the hypothetical question.  Specifically, the ALJ's hypothetical assumed an individual with

> *moderately limited ability to understand and remember detailed*
> *instructions, carry out details, maintain attention and concentration for*
> *extended periods, and moderately [limited] ability to accept instructions*
> *and respond appropriately to criticisms from supervisors*.  And the others
> are not significantly limited.  Now we've recently been told we need to be
> more definitional about what moderately means and we'll approach it this
> way.  There are five categories, one is not significantly limited, two is
> moderately, three is markedly, four is no evidence of limitation in this
> category, and then five is not ratable on available evidence.  So really out of
> the four categories, she, she's been placed in the moderate, which is the
> second lowest level of impairment.  And that is for the 20 questions of the
> various categories of the mental analysis.  So, and then we have the other
> definition of moderately being that it is significant but not precluding
> employment.  Sometimes I've heard that the combination, if they're
> enough, the combination about it as, so that's about the best we can do, four
> out [of] 20 there.  So with those limits in addition to the physical limits,
> would an individual of similar age, education, and prior relevant work be
> able to do those prior jobs, do the retailer's work?

(R. 44-45) (emphasis added).  These limitations were based precisely on Dr. Conroe's assessments in the "Mental Residual Functional Capacity Assessment."  (R. 243-244.) Thus, contrary to Plaintiff's assertion, the ALJ included Plaintiff's non-severe mental impairments in the hypothetical posed to the vocational expert.

Finally, Plaintiff argues that the ALJ mistakenly concluded that because Plaintiff could perform 3-4 step work, she could do semi-skilled work.  The terms "unskilled work," "semi-skilled work," and "skilled work" are defined in 20 C.F.R. § 404.1568, but not in terms of work to be performed in a number of steps.[3]  Nonetheless, even if the ALJ

---

[3]  Semi-skilled work is that

> which needs some skills but does not require doing the more complex work

erred in assuming that Plaintiff's ability to perform 3-4 step work meant that she could

perform semi-skilled work, the conclusion that Plaintiff could perform semi-skilled work

finds substantial support in the record.  In opining that Plaintiff could perform her past

relevant work of order clerk, which is a semi-skilled position,[4] the vocational expert

considered Plaintiff's physical limitations, as set forth by Dr. Salmi, and the full extent of

her alleged mental limitations, as set forth by Dr. Conroe.  (R. 43-46.)  Such a basis for

the vocational expert's opinion is sufficient.

In short, the Court finds that the ALJ properly considered Plaintiff's non-severe

mental impairments in determining her RFC, and that substantial evidence on the record

as a whole supports the ALJ's conclusions.

### 2.      Waiver and Development of the Record

Plaintiff argues that the ALJ failed to obtain a valid waiver of her right to counsel.

She also argues that because she was unrepresented at the hearing, the ALJ had a

heightened duty to develop the record, which he failed to meet.  Plaintiff believes she was

---

duties.  Semi-skilled jobs may require alertness and close attention to
watching machine processes; or inspecting, testing or otherwise looking for
irregularities; or tending or guarding equipment, property, materials, or
persons against loss, damage or injury; or other types of activities which are
similarly less complex than skilled work, but more complex than unskilled
work.  A job may be classified as semi-skilled where coordination and
dexterity are necessary, as when hands or feet must be moved quickly to do
repetitive tasks.

20 C.F.R. § 404.1568.

[4]  The position of order filler, Dictionary of Occupational Titles ("DOT")
§ 222.487-014, has a specific vocational preparation ("SVP") rating of 3.  Jobs with SVP
ratings of 3 are considered semi-skilled.

prejudiced as a result.  Defendant responds that Plaintiff validly waived her right to representation at the hearing, and in any event, Plaintiff has not shown prejudice.

### a.    Waiver

Although a claimant does not have a constitutional right to counsel at a Social Security disability hearing, she has a statutory right to representation should she choose to obtain counsel.  42 U.S.C. §§ 406, 1383(d)(2)(D).  But if a claimant is provided sufficient information to enable her to choose whether to retain counsel or proceed *pro se*, she may waive her right to counsel.  *Filipi v. Shalala*, No. 3-93-785, 1994 WL 706692, at *2 (D. Minn. Sept. 30, 1994).

Plaintiff relies on *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994), to argue that the ALJ was required to explain to Plaintiff: (1) the manner in which an attorney can aid in the proceedings; (2) the possibility of free counsel or a contingency requirement, and (3) the limitation on attorney fees to twenty-five percent of past due benefits and required court approval of the fees.  Other courts, however, have not required the ALJ to use a specific litany to ensure that the claimant is aware of her right to counsel.  *See, e.g., Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508 (2d Cir. 2009).

The United States Court of Appeals for the Eighth Circuit has not mandated the disclosures set forth in *Binion*.  In determining whether a claimant understood the rules and regulations pertaining to her right to counsel, the Eighth Circuit considers any written notices from the SSA explaining the claimant's right to counsel and the claimant's replies.  *Wingert v. Bowen*, 894 F.2d 296, 298 (8th Cir. 1990).  The District of Minnesota examines the same, additionally considering whether the claimant is aware at the hearing

of her right to an attorney.  *See Stroud v. Barnhart*, No. 04-cv-35, 2005 WL 679074, at

\*2 (D. Minn. Mar. 22, 2005) (concluding the claimant was adequately informed of and

knowingly waived her right to counsel because she received at least three notices about

her right to counsel, and at the hearing before the ALJ, acknowledged that she received

the notices and wanted to proceed *pro se*); *Filipi*, 1994 WL 706692, at \*3 (concluding the

claimant knowingly and intelligently waived her right to counsel because she received

two notices about her right to counsel, and at the hearing before the ALJ, acknowledged

that she was aware of her right to an attorney and wanted to proceed *pro se*).

In this case, Plaintiff received at least two written notices from the SSA about her

right to counsel, and she stated her understanding of this right in her request for a hearing

by an ALJ.  Further, at the beginning of the hearing, the ALJ and Plaintiff had the

following exchange:

> ALJ:      First thing, I must ask you whether you would like more time
> to talk to an attorney.  You don't have to have one, but they
> can be helpful, they know the ropes, what evidence to get,
> how to present it . . . the fees would be no more than $6,000,
> but it could be less than that if 25 percent of the past due
> benefits is less.  So with that in mind, would you like to go
> ahead with [the] hearing or would you like more time to talk
> to an attorney?
>
> Plaintiff:   I'd just assume go ahead, sir, Your Honor.
>
> ALJ:      All right, I'll consider that waived then.

(R. 34-35.)  Like the claimants in *Stroud* and *Filipi*, Plaintiff was informed of her right to

counsel on several occasions, by written notice and at the hearing, and she confirmed her

understanding of this right.  Under these circumstances, the record sufficiently supports

the ALJ's conclusion that Plaintiff waived her right to counsel at the hearing.

### b.    Development of the Record

When a claimant is unrepresented, the ALJ has a heightened duty to "fully and fairly develop the record so that a just determination of disability may be made." *Filipi*, 1994 WL 706692, at *5 (citing *Clark v. Shalala*, 28 F.3d 828, 830 (8th Cir. 1994)).  The ALJ, however, is "not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record." *Clark*, 28 F.3d at 830-31.  The ALJ can do so by contacting medical sources and ordering additional consultative examinations, if necessary.  *Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004).  The regulations do not require the ALJ to order a consultative evaluation of all alleged impairments.  *Matthews v. Bowen*, 879 F.2d 423, 424 (8th Cir. 1989).  Rather, "they simply grant the ALJ the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination." *Id.*  Usually, courts defer to the ALJ's judgment regarding how much evidence is necessary to develop the record fully.  *Filipi*, 1994 WL 706692, at *4. A "significant omission is usually required before this court will find that the Secretary failed to assist *pro se* claimants in developing the record fully and fairly." *Id.*

Plaintiff argues that she was prejudiced because the ALJ did not ask about her knee impairment or mental limitations, and the ALJ did not incorporate Plaintiff's non-severe mental impairments into the hypothetical question posed to the vocational expert.

Regarding the knee impairment, the ALJ and Plaintiff had the following dialogue:

ALJ:    Any other physical problems, back, hips, shoulder, and the knee, you have your knee, of course?

Plaintiff:      The knee, yeah, the knee does hurt, too.  When I try to kneel
                to do something, to get back up I have to have a table nearby
                to help pull my weight up.

ALJ:            Have you had any operations for any of those problems, back,
                hips, shoulder, knee?

Plaintiff:      No, I have not because my insurance wouldn't cover it at the
                time.  My insurance wasn't good.

ALJ:            And do you take any, you mentioned you take—

Plaintiff:      They were just giving me, it was like a muscle relaxer and
                then just told me to take Tylenol and stuff.

(R. 38-39.)  The ALJ also read the impressions of an MRI study on Plaintiff's left knee,

provided by Plaintiff at the hearing, into the record.  (R. 35-36.)

The administrative record provided an adequate basis for the ALJ to determine

Plaintiff's disability claim with respect to her knee.  The ALJ expressly considered the

MRI study.  (R. 25.)  In discounting the disabling nature of Plaintiff's knee, the ALJ

noted that Plaintiff rarely saw a doctor for any form of treatment.  (R. 25-26.)  The ALJ

also considered the daily activities in Plaintiff's function report (*i.e.*, cooking full meals,

doing laundry, driving a car, and shopping for groceries), which were inconsistent with

her alleged limitations.  (R. 26.)  Moreover, the ALJ noted Plaintiff's testimony that she

did some household chores; drove herself to the hearing, which was a two-hour commute

in traffic; and relieved her pain with conservative measures, such as taking a hot shower

and Tylenol.  (*Id.*)  The ALJ additionally noted that Plaintiff's "apparent lack of

discomfort during the hearing" affected the credibility of her allegations and RFC.  (*Id.*)

Further, the ALJ considered the opinions of the state agency medical consultants.  (*Id.*)

26

Acknowledging that the medical consultants did not consider Plaintiff's knee complaints because they were not in the record at the time of review, nonetheless the ALJ gave great weight to the opinions because they set forth lifting and postural limitations that adequately compensated also for Plaintiff's knee complaints, and Plaintiff's condition was "generally controllable with over-the-counter medication, such as Tylenol, and with other measures." (*Id.*)  On these facts, there was sufficient basis for the ALJ to determine the merits of Plaintiff's disability claim regarding her knee, and the ALJ did not err by not ordering a new consultative evaluation.  *See Sultan*, 368 F.3d at 863.

As for Plaintiff's mental limitations, the ALJ was not required to ask about them at the hearing or order a new consultative evaluation.  At the hearing, the ALJ gave Plaintiff several opportunities to address any mental limitations by asking, "What do you feel is the main thing that keeps you from working?" and "anything that you think I need to know about why you haven't been able to work?" (R. 38, 41.)  At no point did Plaintiff mention her mental limitations.  And in his order, as discussed earlier, the ALJ noted there was no evidence of mental health treatment in the record; Plaintiff did not allege mental impairments when she applied for disability; and the sole evidence of mental impairments was Dr. Trulsen's one-time consultative examination. (R. 22.)  In analyzing the four functional areas for evaluating mental disorders, the ALJ thoroughly considered Plaintiff's function report, Dr. Trulsen's examination, and the opinions of the state agency psychological consultants. (R. 22-23.)  Thus, the record was sufficiently developed with respect to Plaintiff's alleged mental limitations.

Regarding the hypothetical question to the vocational expert about Plaintiff's

alleged mental limitations, the ALJ incorporated into the question Dr. Conroe's conclusions in the "Mental Residual Functional Capacity Assessment," which, as already noted, included the full extent of Plaintiff's alleged mental limitations even though the ALJ concluded they were not as severe as she claims.  (R. 43-46.)  The ALJ additionally gave Plaintiff the opportunity to ask further questions of the expert, which Plaintiff declined.  (R. 46.)

For these reasons, the Court concludes that Plaintiff validly waived her right to counsel at the hearing before the ALJ, and, further, that the ALJ fully and fairly developed the record.

## IV.    Recommendation

Having reviewed all of the evidence in the record, the Court finds substantial evidence in the record as a whole to support the Commissioner's determination that Plaintiff was not disabled.  Accordingly, **IT IS RECOMMENDED THAT**:

1.    Plaintiff's Motion for Summary Judgment [Doc. No. 14] be **DENIED**;

2.    Defendant's Motion for Summary Judgment [Doc. No. 18] be **GRANTED**; and

3.    Judgment be entered accordingly.


Dated:  November 30, 2014          _s/ *Hildy Bowbeer*_____
                                    HILDY BOWBEER
                                    United States Magistrate Judge

**NOTICE**

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **December 16, 2014**, a writing that specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within fourteen days after service thereof.  A judge shall make a *de novo* determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.